**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

STC.UNM,

     Plaintiff,

v.                                      CIV 17-1123 MV/KBM

QUEST DIAGNOSTICS INCORPORATED
and QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC.,

     Defendants.

# PROPOSED FINDINGS OF FACT
# AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court on two motions filed by Plaintiff STC.UNM ("STC"): its Motion to Dismiss (*Doc. 10*), filed December 7, 2017, and its Motion to Remand (*Doc. 12*), filed December 8, 2017. These motions were not fully briefed until October 29, 2018, when STC filed its Consolidated Reply *Doc. 67.* By two separate Orders of Reference, entered January 31, 2018 and July 30, 2018, the motions were referred to me by the presiding judge to conduct hearings if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of this case. *Doc. 37, 59.* Having reviewed the motions, the memoranda and exhibits submitted by the parties, and the relevant authorities, the Court recommends that STC's Motion to Remand be granted and that Defendant's Motion to Dismiss be denied as moot, as the Court lacks subject matter jurisdiction.

## I.     BACKGROUND

Plaintiff STC is a nonprofit research park corporation formed, owned and controlled by the University of New Mexico's ("UNM's") Board of Regents. *Doc. 1-1* ¶ 5. STC's purpose is to "nurture innovation and catalyze economic development of new technologies developed at UNM." *Id.* ¶ 6. STC furthers its role by "protecting technologies developed at UNM and transferring those technologies to the marketplace, connecting the business community to UNM for access to UNM's expertise, facilities, and research activities, and facilitating UNM's role as a contributor to New Mexico's economic development." *Id.* ¶ 7. STC allows UNM to "more efficiently transfer technology developed at [UNM] to the marketplace through the creation of start-up companies and the negotiation of license agreements with start-ups and established companies." *Doc. 63-1*, at 169 (2015 Designation Application).[1] In short, through the creation of STC, UNM has delegated to it the commercialization of intellectual property. *Doc. 63-1* at 24, Kuuttila Dep. at 90:3-9.[2]

In 2006, STC entered into a License Agreement with Quest Diagnostics Incorporated. *Doc. 63-1*, Ex. 6 at 173-188. Thereafter, STC filed its Complaint, on September 25, 2017, in the Second Judicial District Court, County of Bernalillo, State of New Mexico, asserting claims against Defendant Quest Diagnostics Incorporated and Quest Diagnostic Clinical Laboratories, Inc. (the "Quest

---

[1] Because Quest Defendants uploaded multiple exhibits consolidated into one document, Doc. 63-1, the Court refers throughout to the CM/ECF page numbers of that consolidated exhibit, rather than to the internal pagination.

[2] Elizabeth J. Kuuttila serves as the Chief Executive Officer and Chief Economic Development Officer of STC.UNM.

Defendants") for breach of contract, declaratory judgment, and breach of the implied covenant of good faith and fair dealing. *Doc. 1-1*. Quest Defendants removed the case to federal court on November 9, 2017, and they indicated that "[w]ithin (7) days of filing this Notice of Removal, Quest will file its Answer to Plaintiff's Complaint along with a compulsory counterclaim . . . ." *Doc.1* ¶ 3.

The Notice of Removal asserted three bases for subject matter jurisdiction in federal court. *Doc. 1*. **First**, Quest Defendants contend that subject matter jurisdiction exists because STC alleges a cause of action in which "its rights to relief necessarily depends [sic] on the resolution of a substantial question of federal patent law." *Id.* at 4. Accordingly, they maintain that jurisdiction exists pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a). *Id.* **Second**, they suggest that the Court has exclusive jurisdiction under 28 U.S.C. § 1338(a) and 28 U.S.C. § 1454(a), given their plan to later assert a compulsory federal patent counterclaim. *Id.* at 6-7. In their Notice of Removal, Quest Defendants explained that they "will seek a declaratory judgment" regarding the non-infringement of Licensed Patents. *Id.* at 6. To the extent that STC's claims do not depend upon the resolution of a substantial question of federal patent law, Quest Defendants submit that the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). *Id.* at 7. **Finally**, Quest Defendants assert that the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the action is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. *Id.*

One week after the removal of this action, Quest Defendants indeed filed an Answer asserting counterclaims for declaratory judgments of non-infringement and invalidity. *See Doc. 4* at 21-28. Specifically, Quest Defendants seek a declaration that "Disputed Products" are not "Licensed Products" as defined in the parties' License Agreement because none of the "Disputed Products infringes any valid claim of the 'Licensed Patents.'" *Id* at 17.

## II.    LEGAL STANDARD

An action is removable if the federal district court would have original jurisdiction over the matter. 28 U.S.C. § 1441(a). It is the obligation of the removing party, here Quest Defendants, to establish the subject matter jurisdiction of the federal court. *Huffman v. Saul Holdings Ltd. P'ship*, 194 F.3d 1072, 1079 (10th Cir. 1999). There is a presumption against removal jurisdiction. *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995).

Federal district courts have original jurisdiction over civil actions which arise under "the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Additionally, they have original jurisdiction over civil actions between citizens of different states when the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. 28 U.S.C. § 1332. For purposes of diversity jurisdiction, both the existence of diversity and the requisite amount in controversy must be affirmatively established by a preponderance of the evidence on the face of either the complaint or the removal notice. *Martin v. Franklin Capital Corp.*, 251 F.3d 1284, 1290 (10th Cir. 2001). Diversity jurisdiction requires complete diversity in that no plaintiff be the citizen of the

same state as any defendant. *Gadlin v. Sybron Int'l Corp.*, 222 F.3d 797, 799 (10th Cir. 2000). Furthermore, a defendant may only remove the action to federal court if no defendant "is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b).

## III. ANALYSIS

Before reaching the merits of the parties' claims, the Court must resolve the jurisdictional issue raised by STC's Motion to Remand. Quest Defendants maintain, both in their Notice of Removal and in their Combined Memorandum in Opposition to STC.UNM's Motion to Dismiss and Motion to Remand, that the Court has federal question jurisdiction, patent jurisdiction, patent counterclaim jurisdiction, and diversity jurisdiction. *Docs. 1*; *63*. STC, in contrast, insists that the Court lacks subject matter jurisdiction altogether. *See Doc. 12.* Although the Court concludes that it must determine, first, whether the case must be remanded for lack of subject matter jurisdiction, it concurrently considers the arguments in STC's Motion to Dismiss to the extent that they bear on this analysis.

Quest Defendants invoked the Court's jurisdiction upon removal and therefore bear the burden of establishing that jurisdiction exists, *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002), with "all doubts [being] resolved against removal." *Fajen v. Found. Reserve Ins. Co.*, 683 F.2d 331, 333 (10th Cir. 1982). The Court considers each of the three grounds of jurisdiction asserted by Quest Defendants in turn.

## A. Federal Question or Patent Jurisdiction under 28 U.S.C. § 1331 or 28 U.S.C. § 1338

Under the well-pleaded complaint rule, a suit "arises under" federal law and is appropriate for removal to federal court, when a federal question is presented on the face of the plaintiff's properly-pleaded complaint. *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 9-12 (1983). Here, examination of STC's Complaint, which asserts only state law contract claims, fails to reveal a federal question on its face. Yet, this does not end the inquiry, because federal district courts also "have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . ." 28 U.S.C. § 1338(a). Borrowing from its interpretation of federal question jurisdiction, the United States Supreme Court explained that § 1338(a) jurisdiction extends:

> only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808-09 (1988). Put another way, a case arises under federal patent laws when patent law creates the cause of action or the claims asserted "necessarily raise" an "actually disputed" and "substantial" question of patent law "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 133 S. Ct. 1059 (2013). The Supreme Court has clarified that alternative theories in a complaint may not form the basis for § 1338(a) jurisdiction if patent law is not essential to each of those theories. *Christianson*, 486 U.S. at 801.

STC's state-law claims for breach of contract, declaratory judgment, and breach of the implied covenant of good faith and fair dealing relate to the parties' License Agreement. STC's claims were not created by federal patent law but by state contract law. The question becomes, then, whether STC's right to relief on these claims necessarily depends on resolution of a substantial question of federal patent law. In answering that question, STC urges the Court to follow the rationale applied by the Federal Circuit Court of Appeals in *University of Florida Research Foundation, Inc. v. Medtronic plc*, No. 16-2422, 2017 WL 6210801, at *2 (Fed. Cir. Jan. 27, 2017). The factual similarities between *Medtronic* and the present case are striking. Indeed, the only factual difference that the Court can discern is a slight variation in the procedural posture: *Medtronic* being decided on appeal by the Federal Circuit, the appellate court with jurisdiction over patent appeals, and the present case being decided in the first instance by a federal district court.

In *Medtronic*, the University of Florida Research Foundation ("the research foundation") moved to dismiss or transfer an appeal to the Eleventh Circuit Court of Appeals. *Id.* at *1. The case involved a license agreement, into which the research foundation had previously entered with a company later acquired by Medtronic. *Id.* Under the license agreement, the licensee agreed to pay royalties to the research foundation on "Licensed Products." *Id.* The agreement defined "Licensed Products" as those covered by specified patents. *Id.* The licensee agreed to provide a "certified full accounting statement" of the royalty amounts payable to the research foundation and to maintain "books and records sufficient

to verify the accuracy and completeness" of the accounting. *Id*. Moreover, the licensee agreed to "take all steps necessary so that" the research foundation could "audit, review, and/or copy all books and records" in order to "verify the accuracy of [the] accounting." *Id*. When Medtronic refused a request by the research foundation to audit records, the research foundation filed suit in Florida state court, asserting claims for breach of contract and breach of the implied duty of good faith and fair dealing and seeking a declaratory judgment on its right to an accounting. *Id*. Medtronic counterclaimed for declaratory judgments of "noninfringement and invalidity" and for a determination that the disputed products were not "Licensed Products" because they did not infringe valid patents. *Id*. Medtronic removed the action to federal court, asserting both diversity jurisdiction and patent jurisdiction. *Id*. The federal district court granted the research foundation's motion to remand and Medtronic appealed. *Id*.

Medtronic argued that the research foundation's claims to an audit arose under patent laws, because its right to relief on its audit claim depended on whether the disputed products qualified as "Licensed Products" covered by the parties' license agreement. *Id.* at *2. The research foundation countered, arguing that the claims in its complaint, including its request for a declaratory judgment of entitlement to an audit of Medtronic's accounting, did not require the court to determine patent infringement issues. *Id*.

Critically, the Federal Circuit offered the following rationale in determining that it lacked patent jurisdiction: "We interpret the Research Foundation's complaint to assert a contract claim seeking an accounting that is not dependent

on whether the products as to which that accounting is sought qualify as 'Licensed Products' under the license agreement." *Id*. The Federal Circuit explained that although the research foundation's "*ultimate* right to monetary relief" stemming from the failure to pay royalties might give rise to *future* compulsory patent counterclaims by Medtronic, the immediate claims at issue – those asserted by the research foundation in its complaint – could be resolved without resort to patent law. *Id* (emphasis added). Because the research foundation's claims did not arise under federal patent law, the Federal Circuit concluded that it therefore lacked jurisdiction over the appeal. *Id*.

*Cellport Systems Inc. v. Peiker Acustic GMBH & Co. KG*, 762 F.3d 1016 (10th Cir. 2014) is also instructive, though not as factually similar as *Medtronic*. In *Cellport Systems*, the plaintiff sued its licensee for refusing to pay royalties or to provide an accounting on certain products allegedly covered by a license agreement. *Id*. at 1019. The licensee maintained that the plaintiff could only claim royalties on products that practiced the plaintiff's patents. *Id*. at 1022. The plaintiff insisted that it was entitled to royalties on sales of "Licensed Products," as defined by the license agreement, and that the agreement did not require any patent infringement analysis. *Id*. After the district court determined that the licensee owed royalties on only two of seven products, the plaintiff appealed. *Id*. at 1018. The licensee cross-appealed and moved to transfer the appeal to the Federal Circuit based upon federal patent jurisdiction. *Id*. at 1021. The Tenth Circuit denied the licensee's motion to transfer, holding that patent law was not essential to determining whether the licensee breached its royalty obligations

under the parties' license agreement. *Id.* at 1023. The court emphasized that the plaintiff's "complaint state[d] claims based on contract law, not patent law." *Id.* at 1021. Moreover, the court found that it could ascertain whether royalties were owed on certain products without resolution of a substantial question of federal patent law. *Id.* at 1023. As a result, the plaintiff's breach of contract claims did not give rise to federal patent jurisdiction. *Id.*

As in *Medtronic* and *Cellport Systems*, STC's right to relief on its contract claims does not depend on the resolution of a substantial question of federal patent law. A court need not determine whether patents have been infringed in order to resolve STC's contract claims. Instead, a court need only decide: (1) whether Quest Defendants breached the parties' License Agreement by failing to permit an audit; (2) whether Quest Defendants breached their duty of good faith and fair dealing in failing to cooperate and provide a meaningful audit; and (3) whether STC is entitled to a declaratory judgment in its favor concerning the scope of the contemplated audit. A court can construe the parties' License Agreement's audit provisions and Quest Defendants' duties thereunder without determining whether any products infringe the licensed patents. Accordingly, Quest Defendants have failed to establish federal question or patent jurisdiction based upon STC's claims, and the Court therefore recommends a finding that no such jurisdiction exists.

## B. Removal Jurisdiction under 28 U.S.C. § 1454

In their Notice of Removal, Quest Defendants also assert jurisdiction pursuant to 28 U.S.C. § 1454, which provides removal jurisdiction in a case in

which "*any party* asserts a claim for relief arising under any Act of Congress relating to patents." § 1454 (emphasis added). According to Quest Defendants, § 1454 jurisdiction arises here because they assert "a Counterclaim where [STC's] right to relief necessarily depends on the resolution of a substantial issue of federal patent law." *Doc. 1* at 6. "[B]y enacting Section 1454, Congress has broadened federal court removal jurisdiction to better ensure that whenever claims arise under federal patent law, they are removable, irrespective of who asserted them." *Univ. of Ken. Research Found., Inc. v. Niadyne, Inc.*, No. Civ. 13-16-GFVT, 2013 WL 5943921, at *5 (E.D. Ky. Nov. 5, 2013).

Curiously, at the time they removed this case, Quest Defendants had not yet asserted a counterclaim at all. It was a week *after* removal to this Court that they filed their Answer to STC's Complaint and Counterclaims. *Compare Doc. 1* (filed Nov. 9, 2017), *with Doc. 4* (filed Nov. 16, 2017). The Notice of Removal itself merely indicated that Quest Defendants "*will seek* a declaratory judgment that none of the products identified in Exhibit F to STC's Complaint in the State Court Action infringes any of the Licensed Patents, and are, therefore, not Licensed Products." *Doc. 1* at 7 (emphasis added). As such, no party had technically asserted – at least not in any pleading before the Court – a claim for relief under any Act of Congress relating to patents at the time of removal.  This begs the question whether Quest Defendants' reference to *anticipated* patent counterclaims in its Notice of Removal conferred patent counterclaim jurisdiction upon this Court.

STC contends that removal under § 1454 was improper prior to the formal filing of Quest Defendants' patent counterclaims in a pleading, citing *Masimo Corp. v. Mindray DS USA, Inc.*, No. 14-0405 SDW/SCM, 2015 WL 93759 (D.N.J. Jan. 7, 2015). In *Masimo*, the plaintiff filed suit in state court alleging state law contract claims against the defendant in connection with a purchasing and license agreement under which the plaintiff agreed to license patented technology to the defendants. 2015 WL 93759, at *1. The defendant removed the action to federal court, alleging that the court had original jurisdiction over patent infringement claims that were implicated by the plaintiff's claims. *Id.* The plaintiff moved to remand, noting that no counterclaims had been filed in any pleading and maintaining that removal had therefore been improper. *Id.* After the motion to remand was fully briefed, the defendant filed its answer with counterclaims and argued that the motion to remand was thereby rendered moot. *Id.* The plaintiff responded that removal under § 1454 remained improper given the lack of any formally-asserted patent claims at the time of removal. *Id.*

Guided by the plain language of § 1454, which requires a party to "*assert*[] a claim for relief," and the strict construction of removal statutes, the District of New Jersey determined that the defendant's "reference to potential patent law counterclaims in its Notice of Removal [was] insufficient to establish jurisdiction pursuant to Section 1454." *Id.* at *3. That the defendant did *eventually* assert removable counterclaims in its answer, after removal, did not alter the Court's conclusion. *Id.* at *4. The court offered the following rationale:

> This Court would be hard-pressed to find that simply referencing
> an anticipated patent counterclaim in a Notice of Removal is

sufficient to establish jurisdiction under Section 1454. To permit such a finding, would allow for certain anomalous results. For example, a defendant could file a Notice of Removal on the basis of anticipated patent counterclaims, and then subsequently file a motion to dismiss before ever actually filing the answer and counterclaims. A court could then assert jurisdiction and rule on a motion without ever having any patent claims asserted in the case in federal court. In such a case, a federal court would be ruling on pure state law issues. Essentially, [it] would allow federal courts to obtain jurisdiction over cases in which federal patent claims are never in fact asserted. Such results could not be in line with the intentions of Congress when it enacted Section 1454.

*Id.* at *4.

This Court finds the District of New Jersey's rationale compelling. To the extent that Quest Defendants removed this matter on the basis of patent counterclaim jurisdiction in the absence of any properly-asserted patent counterclaims, removal was indeed improper. The Court recommends against a finding of patent counterclaim jurisdiction.

## C. Diversity Jurisdiction

Quest Defendants insist that the Court may also exercise diversity jurisdiction, pursuant to 28 U.S.C. § 1332, because this action is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of costs and interest. *See Doc. 1* ¶ 24. Quest Defendants assert that they are citizens of Delaware and New Jersey, as they were each incorporated in Delaware but maintain principal places of business in New Jersey. *See Doc. 1* ¶ 8-9. They suggest that STC, on the other hand, is a citizen of New Mexico as a "New Mexico nonprofit research park corporation, with a principal place of business in Albuquerque, New Mexico." *Id.* ¶ 25.

STC maintains that it cannot be considered a "citizen" of New Mexico, because it is an arm of the state that enjoys Eleventh Amendment Immunity. *Doc. 12* at 6. Indeed, diversity jurisdiction only exists for actions "between citizens of different states," 28 U.S.C. § 1332, and an "arm or alter ego of a state" cannot be characterized as a "citizen" for diversity purposes, *Dougherty v. Univ. of Okla. Bd. of Regents*, 415 F. App'x 23, 25 (10th Cir. 2011); *Moor v. Alameda Cty.*, 411 U.S. 693, 717 (1973).

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the explicit terms of the Eleventh Amendment do not include citizens' suits against their own state, federal courts have broadly construed the amendment to render states immune from suits brought by private parties in federal court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). Absent a waiver of immunity, the Eleventh Amendment shields states, and governmental entities that are "arms of the state," from suit in federal court, leaving parties to pursue claims against such parties in state court. *See Duke v. Grady Mun. Schs.*, 127 F.3d 972, 974 (10th Cir. 1997).

To determine whether a party is an "arm of the state" for purposes of Eleventh Amendment immunity, the Tenth Circuit requires two general inquiries. *See id.* at 974. First, a court should examine the degree of autonomy given to the entity. *Id.* Second, and most importantly, the court should consider the extent of

financial independence enjoyed by the entity. *Id.* An entity is immune, for instance, if a "money judgment sought is to be satisfied out of treasury." *Id.* According to the Supreme Court, "the vulnerability of the State's purse [i]s the most salient factor in Eleventh Amendment determinations." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994).

From these general inquiries, the Tenth Circuit has derived five factors to be considered in the arm-of-the-state analysis: (1) how the entity is characterized under state law; (2) how much guidance and control the state exercises over the entity; (3) how much funding the entity receives from the state; (4) whether the entity enjoys the ability to issue bonds and levy taxes; and (5) whether the state would bear legal liability to pay a judgment against the entity. *Colby v. Herrick*, 849 F.3d 1273, 1276 (10th Cir. 2017).

As a starting point in its analysis, the Court acknowledges that the State's institutions of higher learning and their boards of regents are arms of the State of New Mexico. *See, e.g., Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 575 (10th Cir. 1996) ("Our cases have consistently found state universities are arms of the state."); *Korgich v. Regents of N.M. Sch. of Mines*, 582 F.2d 549, 551 (10th Cir. 1979); *Mohammad v. Metro. Ct.,* No. 16-473 MV/KK, 2017 WL 3172838, at *4 (D.N.M. May 31, 2017). Therefore, at this juncture, the Court must determine whether such Eleventh Amendment immunity extends to STC, a New Mexico nonprofit research park corporation formed by a state university and its board of regents.

## 1. Characterization Under State Law

In addressing the characterization of STC under state law, the Court may consider relevant state statutes, regulations, and constitutional provisions characterizing the entity, as well as relevant holdings of state courts. *See Kan. State Univ. v. Prince*, 673 F. Supp. 2d 1287, 1300 (D. Kan. 2009). The legislation under which STC was created, the University Research Park and Economic Development Act ("the Act" or "URPEDA"), is the most critical legislation for the Court's consideration under this factor. The language of the Act, however, cuts both ways. It explicitly provides that a research park corporation should be deemed an agency or other political subdivision of the state for some purposes but not for others. More specifically, under the Act, a research park corporation

> shall *not* be deemed an agency, public body or other political subdivision of New Mexico, including for purposes of applying statutes and laws relating to personnel, procurement of goods and services, meetings of the board of directors, gross receipts tax, disposition or acquisition of property, capital outlays, per diem and mileage and inspection of records.

NMSA 1978 § 21-28-7(A) (emphasis added). Conversely, according to the same act, a research park corporation "*shall* be deemed an agency or other political subdivision of the state for purposes of applying statutes and laws relating to the furnishing of goods and services to the university that operates it and the risk management fund." NMSA 1978 § 21-28-7(B) (emphasis added). Moreover, the Act specifies that research park corporations, as well as their officers, directors and employees, enjoy immunity from tort liability pursuant to the Tort Claims Act. NMSA 1978 § 21-28-7(C). Further, the Act provides that losses suffered by a

research park corporation "may be included among losses covered by the risk management fund of New Mexico." N.M.S.A. 1978 § 21-28-7(C).

Conceding that research park corporations may be considered agencies of the state for "*limited* purposes," Quest Defendants maintain that STC's separate corporate existence under New Mexico law nevertheless weighs against a finding of Eleventh Amendment immunity. *Doc. 63* at 17-19. They argue that "[c]ourts have recognized that nonprofit corporations generally do not qualify for immunity as an arm of the state." *Id.* at 17 (citing *Ormsby v. C.O.F. Training Servs., Inc.*, 194 F. Supp. 2d 1177, 1185 (D. Kan. 2002)). They note that, by virtue of STC's classification as a corporation, it enjoys the power to sue and be sued in its corporate name, to make contracts, to incur liabilities and borrow money, and to enter into license agreements involving intellectual property. *Id.* at 18 (citing N.M.S.A. 1978 § 21-28-6).

But the Tenth Circuit's rationale in *Sturdevant v. Paulsen*, 218 F.3d 1160 (2000) suggests that the corporate structure of an agency does not resolve the issue of whether it constitutes an arm of the state. There, the entity at issue, the Colorado State Board for Community Colleges and Occupational Education, was described as a "'body corporate' with the power to hold 'money, lands, or other property'" and, yet, the court found that the entity's corporate status did not preclude its characterization as an arm of the state. *Id.* at 1163. The court acknowledged that the corporate structure may be used "for the purpose of providing a convenient means for allowing [the university] to pursue the ends of higher education." *Id.* at 1167.

Here, STC's corporate structure does not weigh in favor of, nor against, a finding of Eleventh Amendment immunity. *See id.* at 1167; *see also Hamilton Mfg. Co. v. Trs. of State Colls. in Colo.*, 356 F.2d 599, 601 (10th Cir. 1966) (holding that the Board of Trustees of the State Colleges in Colorado were entitled to Eleventh Amendment immunity despite designation as a "body corporate"); *U.S. ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 401 (5th Cir. 2004) (holding that the Regents of the University of California were an arm of the state even though they managed the laboratory at issue through a corporate structure); *Donald v. Univ. of Cal. Bd. of Regents*, 329 F.3d 1040, 1044 (9th Cir. 2003) (holding that the Regents of the University of California, as manager of a university hospital, qualified as an arm of the state despite their corporate organization).

Consequently, the Court is left with competing legislative descriptions of a research park corporation under URPEDA as the primary indication of the State's characterization of STC. Although the Act suggests that STC is not a state agent for certain purposes, the Court concludes that the New Mexico Legislature's articulation favors a finding that a research park corporation *is* an arm of the state for Eleventh Amendment immunity purposes. In contrast to the language that the Legislature has sometimes used to specify that entities are separate and apart from the state, URPEDA expressly anticipates that STC will be treated as a state agency for certain purposes. *Contra Lucero v. N.M. Lottery Auth.*, No. 07cv0499 JCH/RLP, 2008 WL 7467977, at *2 (D.N.M. July 7, 2008) (noting both § 6-24-2(C)'s description of the New Mexico Lottery Authority as "a business enterprise

separate from state government" and § 6-24-5's description of the Authority as a "public body, politic and corporate, separate and apart from the state"); *Jornigan v. N.M. Mut. Cas. Co.*, No. CIV 03cv0813 JB/ACT, 2004 WL 3426120, at *7 (D.N.M. July 14, 2004) (noting N.M.S.A. 1978 § 52-9-4's description of New Mexico Mutual Casualty Company, as one created by the state as a "nonprofit, *independent*, public corporation").

Ultimately, that STC is deemed by the Legislature to be an agency of the State for certain significant purposes, such as for laws relating to the provision of goods and services to UNM, for participation in the risk management fund, and for tort liability under the Tort Claims Act, weighs in favor of granting STC Eleventh Amendment immunity.

### 2. Guidance and Control Exercised by the State

According to STC, URPEDA itself contemplates considerable control by the State over STC's management and operations. *Doc. 10* at 9. For example, STC notes that the Act requires it to perform annual independent audits and to provide copies of those audits to the UNM Board of Regents and the New Mexico Secretary of State. *Id.* (citing N.M.S.A. 1978, § 21-28-17). Moreover, the UNM Board of Regents is charged by statute with appointing STC's board of directors. *Id.* (citing N.M.S.A. 1978, § 21-28-4(B)).

STC insists the powers it has been granted as a research park corporation are "subordinate to the broad powers given to [UNM] Board of Regents to 'operate,' 'finance' and otherwise establish guidelines controlling [STC]." *Doc. 10* at 9. Section 21-28-6, which outlines the "Powers of research park corporations,"

gives STC the power to, among other things, approve or disapprove proposals; sue and be sued; purchase, own, and dispose of property, including intellectual property; sell or otherwise dispose of assets and property; make contracts and borrow money; receive and administer grants; and invest funds. NMSA § 21-8-6. By contrast, Section 21-28-5 outlines the "[p]owers of [the] university as related to research parks," giving the UNM Board of Regents the power to, among other things, establish and operate research parks; form research park corporations; lease and sell personal and real property to research parks on terms and conditions established by the regents; construct or acquire buildings and improvements, including research and service facilities; allow a lessee or purchaser of university land to acquire or construct suitable buildings, facilities and improvements upon the land; finance the costs of the research park; conduct, sponsor, finance and contract in connection with technological innovations of all kinds; and "anything else that the regents deem appropriate to further the purposes of the University Research Park and Economic Development Act either directly or indirectly." § 21-28-5(A). Furthermore, the statute provides that the "specification of powers [of the Board of Regents as related to research parks] is not exclusive and shall not be construed to impair or negate any other power or authority enjoyed by the regents under the constitution or laws of this state." § 21-28-5(B). Having considered the respective powers granted by statute to STC and UNM Board of Regents, the Court agrees that those granted to the Regents are far broader and superior to those granted

to STC and that the disproportionate powers support a finding of significant state control.

Further, pursuant to its Articles of Incorporation, STC is to be "operated, exclusively for the benefit of, to perform the functions of, or carry out the purposes of, the University of New Mexico" and, further, "shall be operated, supervised, or controlled by the University of New Mexico." *Doc. 11-2*, Ex. A, at 9-10 (Article III(b) and (c)). The Articles provide that UNM Board of Regents is the sole corporate member and that upon dissolution of STC, all "assets shall be distributed" to the Regents. *Id.* at 10 (Article V-VI).

Similarly, STC's By-laws reiterate that STC is organized exclusively for the benefit of UNM and that the UNM Board of Regents is the only corporate member. *Doc. 11-2*, Ex. B, at 2 (Articles I and III). They also provide that any member of the UNM Board of Regents may call a special meeting. *Id.* at 3 (Article III). Pursuant to the By-laws, the number of directors on the Board who are UNM employees may not exceed 40 percent. Yet, in addition to STC's President and CEO, the Board must include UNM's President, Provost and Executive Vice President for Academic Affairs, Vice President for Research, the Executive Vice President for Administration, Executive Vice President for Health Science, a UNM academic dean, two members of the UNM faculty, and one member of the UNM Board of Regents. *Id.* at 3 (Article IV, § 1). STC suggests that requiring UNM officials to serve on STC's Board allows the State to exert significant control over STC.

Quest Defendants note that only 40 percent of the total number of directors are permitted to be UNM employees. *See Doc. 63* at 21 (citing *Doc. 11-2*, Ex. A to Kuuttila Decl., at 3). According to Quest Defendants, requiring 60 percent of the board members to be employed outside UNM significantly limits UNM's control over STC. *Id.* Still, nominations to the board must be presented to the UNM Board of Regents for "approval or disapproval," and the UNM President is charged with appointing the UNM academic dean and members of UNM faculty. *Doc. 11-2*, Ex. B, at 3 (Article IV, § 2). Directors may be removed by UNM Board of Regents for cause. *Id.* at 4 (Article IV, § 7). That there is some limitation on the number of state employees serving on the Board does not diminish the significant control by UNM through the UNM Regents' selection and retention of board members.[3] *See Watson*, 75 F.3d at 576 (board members appointed by the university president with the approval of the institutional council); *Colby*, 849 F.3d at 1277 (commissioners appointed and removed by the governor); *Sturdevant*, 218 F.3d at 1169 (board predominantly made up of state executive appointees).

Even so, Quest Defendants submit that STC's independence from UNM is its "hallmark" and its primary purpose, as the research park corporation was a created to "bridge" relationships between UNM and the business community. *Doc. 63* at 19 (citing Kuuttila Dep. at 193:16-21). They note that according to the

---

[3] Indeed, STC's CEO reports that in 2004 the UNM Board of Regents became dissatisfied with the composition of the board and refused to confirm the appointments of three or four board members, choosing instead to select and appoint different board members and requiring amendment to the governing documents to allow UNM greater control over the board. *Doc. 63-1* at 47, Kuuttila Dep. at 183:22-184:5.

Revised Memorandum under which STC operates, STC has the power to organize itself and employ staff as it sees fit in fulfilling its responsibilities to UNM. *See id.* at 20 (citing Ex. 4 to Kuuttila Decl., at 2, ¶ 1.3 and Kuuttila Dep. at 97:7-22). Further, STC pays its own employee salaries and provides employee benefits. *Doc. 63*, at 20 (citing Kuuttila Dep. at 32:21-33:10; 33:23-34:20).

STC, however, maintains that it is not the day-to-day operations of a given entity which drive the arm-of-the-state analysis. *Doc. 67* at 13-14. The Court's rationale in *Watson* supports such a notion.

In *Watson*, the Tenth Circuit described the university medical center as "clearly . . . not autonomous from the University or the state" despite the center's operation of its own patient care programs "virtually . . . in the public sector, competing with other private nonprofit entities" and its ability to increase its own revenues through control over patient billing. *See Watson*, 75 F.3d at 576. The *Watson* court emphasized that the university, through its president, was responsible for appointing members of the medical center's board of directors with approval by the institutional council. *Id.* Further, the university president retained authority to "grant final approval for the long range plan of the Medical Center, the annual budget and appropriations request, major construction, capital financing, fund raising programs, and University policies, procedures, rules, and regulations 'relating to or affecting' the Medical Center." *Id.* The medical center's by-laws described it as a "component organization" of the university, and the chief operating officer of the medical center reported directly to the university vice president for health sciences. *Id.* Although the court characterized it as a "close

case" given the medical center's limited state funding, the state's control through appointing board members, approving its budget, and engaging in long-range planning weighed in favor of Eleventh Amendment immunity. *See id.* at 576-77.

Where UNM exerts a similar degree of control over STC here, appointing its board of directors, reviewing its annual audits, and "operat[ing]," "supervis[ing]," and "control[ing]" its functions, this factor weighs strongly in favor of a finding that STC is indeed an arm of the state.

### 3. Funding Received from the State

The Act expressly grants the UNM Board of Regents the power "to finance all or part of the cost of [a] research park," including the purchase, construction, remodeling, and maintenance of buildings and equipment. N.M.S.A. 1978, § 21-28-5(A)(8). According to the testimony of STC's CEO, "between 80 and 90 percent of STC's budget comes from direct cash funding or indirect funding via commercialization of UNM intellectual property." *Doc. 63-1* at 48-49, Kuuttila Dep. at 189:22-190:3. STC's licensing income is derived entirely from UNM's assignment of its intellectual property to the research park corporation. *Id.* at 190:7-11. Indeed, STC's CEO testified that STC's salaries, benefits, retirement funds, private insurance, and legal representation come from UNM or the income derived from UNM's intellectual property. *Id.* at 191:12-192:1. Further, STC's budget is approved by the University and its financial audits are reviewed by UNM Board of Regents and approved annually. *Id.* at 181:2-21.

Conceding that UNM "retains some budget oversight," Quest Defendants emphasize that UNM "does not control how every dollar is spent at STC."

*Doc. 63* at 21. In the Court's view, however, STC's financial dependence on UNM is quite substantial, far more substantial than it was in *Watson* and *Colby*, where the subject entities received less than ten percent of their revenue from state appropriations. *See Watson*, 75 F.3d at 576; *Colby*, 849 F.3d at 1277 n.2. As such, this factor weighs heavily in favor of Eleventh Amendment immunity.

### 4. Ability to Issue Bonds and Levy Taxes

The Act grants research park corporations, like STC, the authority to issue bonds and other obligations, which are "deemed issued on behalf of the university." *See* NMSA 1978, § 21-28-9. By statute, any income from bonds issued by a research park corporation are free from taxation. *See* NMSA 1978, § 21-28-16. Quest Defendants reference testimony by STC's CEO, however, that it has never issued a bond in her 15-year tenure with STC. *Doc. 63* at 22 (citing Kuuttila Dep. at 176:6-25; 177:1-10).

Although the parties agree that STC does not, in fact, issue bonds or levy taxes, (*see Docs. 63* at 23; *67* at 13), the parties interpret the significance of this fact differently. Quest Defendants maintain that when an entity, like STC, uses methods other than bonds and taxes to raise money, it behaves like a nonprofit, rather than a division of the State, which suggests that it is not an arm of the state for Eleventh Amendment immunity purposes. STC maintains otherwise.

The Tenth Circuit's opinions in *Colby* and *Sturdevant* lend credence to STC's interpretation. In *Colby*, the court explained that the power of the subject entity to issue bonds "cut *against* Eleventh Amendment immunity." *Colby*, 849 F.3d at 1277 (emphasis added). The court offered more explanation in

*Sturdevant*, explaining that bond-issuing and tax-levying authority are considerations in the arm-of-the-state analysis, not because they distinguish an arm of the state from a non-profit, but because they are "characteristic attribute[s] of a political subdivision," which is not entitled to Eleventh Amendment immunity. *See Sturdevant*, 218 F.3d at 1170. Applying the logic of *Colby* and *Sturdevant* to this case, STC's statutory power to issue bonds weighs *against* Eleventh Amendment immunity, though the weight may be somewhat diminished by the fact that STC has never actually exercised that authority. As for the authority to levy taxes, STC lacks such authority (*see Docs. 63* at 23; *57* at 13), which weighs *in favor* of Eleventh Amendment immunity. *See Sturdevant*, 218 F.3d at 1170.

Ultimately, where STC admittedly lacks taxing authority and has never exercised its statutory bond-issuing authority, the Court considers this factor weighing more heavily toward a finding of Eleventh Amendment immunity.

### 5. Liability to Pay Judgments

The final factor, which courts have regarded as the most significant one, has at times been problematic in its application. In *Sturdevant*, for example, the Tenth Circuit described the factor as a "particularly important" one but ultimately declined to resolve it. *Sturdevant*, 218 F.3d at 1164-66. The court explained that there was a "lack of clarity" as to the operation of Colorado's risk management fund with respect to the defendant board and the state's legal liability for a potential judgment against it. *Id.* at 1166.

Here, the New Mexico Legislature has explicitly addressed participation by research park corporations in the State's risk management fund.[4] New Mexico Statute Annotated § 21-21-7 provides that a research park corporation is deemed to be an "agency or other political subdivision of the state for purposes of . . . the risk management fund." § 21-28-7(B). Further, STC's enabling statute contemplates that its losses "may be included among losses covered by the risk management fund of New Mexico." § 21-28-7(C).

In addition to these applicable statutes, the Risk Management Division offered its own understanding of STC's coverage by the fund in a 1994 letter from the Deputy Director of New Mexico's Risk Management Division to UNM counsel. There, the division expressly confirmed that "since [STC] is established by [UNM]," the Risk Management Division considers it, its officers, directors, and employees to be covered "the same as [UNM] under the public liability fund." *Doc. 12-3*, Ex. C, at 2. Likewise, the Risk Management Division issued an Evidence of Coverage on July 1, 2017, naming both STC and the "State of New Mexico" as insureds and outlining the insurance coverage available. *Doc. 11-4*, Ex. D, at 2.

Quest Defendants point out that the 1994 letter from the Risk Management Division goes on to address STC's access to other coverages under the risk management fund, however. *Doc. 63* at 23 (citing *Doc. 11-3*, Ex. C, at 2-3). Indeed, the letter explained that it was the Risk Management

---

[4] Generally speaking, the Risk Management Fund covers state governmental entities for risks for which sovereign immunity has been waived under the Tort Claims Act. *See* N.M.S.A. 1978, § 41-4-20, *et seq.*

Division's "initial conclusion" that coverages for "public property, surety bond, worker's compensation, and unemployment compensation" were not available to STC, because it is a non-profit corporation. *Doc. 11-3*, Ex. C, at 2-3. Quest Defendants maintain that "the record is clear that STC purchases and pays for insurance from the private sector for coverage such as public property, surety bond, worker's compensation, unemployment compensation, medical malpractice, boiler and machinery, fine arts, et cetera." *Doc. 63* at 24 (citing *Doc. 11-4*, Ex. D; Kuuttila Dep. at 56:20-23, 57:17-21, 61:10-16, 161:14-25, 165:19-23, 166:17-25, 167:1-20). Accordingly, they suggest that there are many causes of action for which STC does not enjoy coverage under the risk management fund. *Id.* at 24. STC counters, referring the Court to its 2018 "Evidence of Coverage," which shows that it has each type of coverage listed by Quest Defendants in conjunction with the State and UNM. *Doc. 67* at 13 (citing *Doc. 63-1*, at 132).

The Court agrees with STC that its more recent Evidence of Coverage trumps any "initial conclusion" articulated in the Risk Management Division's 1994 letter. Furthermore, in *Sturdevant*, the Tenth Circuit rejected a similar argument to the one advanced by Quest Defendants here, dismissing as unsupported the plaintiff's position that the "details of a risk management fund" rendered an entity ineligible for characterization as an arm of the state for certain types of claims. *See Sturdevant*, 218 F.3d at 1165. The court "decline[d] to answer the state law question of the precise application of the risk management statute to particular claims." *Id.*

Perhaps more importantly, the Tenth Circuit cautioned against delving into the details of a risk management fund's operation to the extent that it might "eclipse a fundamental distinction . . . between alter egos or instrumentalities of the state on the one hand, and political subdivisions such as cities and counties on the other." *Id.* at 1170. Explaining that Eleventh Amendment immunity does not extend to "counties and similar municipal corporations," the Tenth Circuit distilled the arm-of-the-state analysis down to one primary inquiry: whether the entity is "more like a county or city than . . . like an arm of the state?" *Id.* at 1163-64. The court explained that "political control by some community other than the state as a whole" is a "fundamental characteristic of a political subdivision." *Id.* at 1170. Further, it noted that the Tenth Circuit has "consistently held that state colleges and universities are arms of the state, whereas local school boards are political subdivisions." *Id.*

Where NMSA § 21-28-7 and STC's Evidence of Coverage confirm that STC participates in the risk management fund in the same manner as UNM, the Court cannot say that STC's purchase of private insurance for some types of coverage somehow precludes Eleventh Amendment immunity. Rather, STC's participation in the State's risk management fund suggests that judgments against it would expose the State to liability. The State's liability for STC's judgments, in turn, weighs in favor of arm-of-the-state status. *See Colby*, 849 F.3d at 1277 (explaining that the entity's participation in Colorado's risk management fund "supports consideration . . . as an arm of the state"); *see also Watson*, 75 F.3d at 576-78 (reasoning that although the medical center was

practically self-funded, there was evidence that "the bulk of any judgment would be paid from the state Risk Management Fund," which supported a determination that the medical center was an arm of the state).

Returning to the fundamental distinction between counties and cities and arms of the state, which the Tenth Circuit has implored courts to consider over and above the details of a risk management fund's operation, the Court is satisfied that STC's primary function is to benefit UNM, a state university, as well as the State of New Mexico as a whole. *See Doc. 63-1* at 21, Kuuttila Dep. at 79:9-80:6 (explaining that STC was formed to benefit UNM and the State of New Mexico through technology transfer and economic development); *see also Doc. 11-2*, Ex. B, at 2 (By-laws); *Doc. 11-2*, Ex. A, at 9-10 (Articles of Incorporation); *Doc. 63-1*, Ex. 4, at 142 (Revised Memorandum of Agreement Between the Regents of UNM and STC) (UNM "desires to enhance the economic well-being of the State of New Mexico [and] through the operations of STC, which brings special expertise to the commercialization of University-owned intellectual property, new business ventures and new jobs will be created and existing New Mexico business will be helped"). As such, STC is more akin to an arm of the state than a county or city.

Considering the application of the relevant factors, the Court finds that they largely mirror the Court's application of these same factors in *United States ex rel. Burlbaw v. Regents of New Mexico State University*, 324 F. Supp. 2d 1209, 1213 (D.N.M. 2004). In *Burlbaw*, Judge Bruce Black held that a university-operated entity, the Physical Science Laboratory ("PSL"), was an arm of the state

entitled to Eleventh Amendment immunity. *Id.* at 1214-15. Judge Black explained that although PSL enjoyed some degree of independence in contracting and was largely self-funded, its budget, property, director, and contracting activities were subject to the control of the university. *See id.* So too STC maintains autonomy in certain areas, including the ability to make contracts, to sue and be sued, and to organize itself and employ staff; nevertheless, UNM and its Board of Regents exert significant control over STC in nearly every relevant way. On balance, the Court finds that application of the relevant factors supports a finding that STC *is* an arm of the state protected by Eleventh Amendment immunity and that the Court lacks diversity jurisdiction over the claims at issue.

Relatedly, there is no indication that STC has waived its immunity. Typically, a waiver of Eleventh Amendment immunity exists when the State "makes a clear declaration that it intends to waive immunity, such as by statute . . . or when the [S]tate voluntarily invokes federal jurisdiction." *Tegic Commc'n Corp. v. Bd. of Regents of Univ. of Tex. Sys.*, 458 F.3d 1335, 1340 (Fed. Cir. 2006). Neither a statute waiving immunity nor a voluntary invocation of federal jurisdiction exists here. As explained above, STC's Complaint asserts state contract claims arising under the parties' License Agreement and does not assert claims arising under federal law.

For all of these reasons, the undersigned recommends that presiding District Judge Martha Vazquez find that federal court lacks diversity jurisdiction, just as it lacks other varieties of subject matter jurisdiction, and remand this case to state court.

**D. Attorney's Fees**

Finally, STC requests an award of attorney fees it incurred as a result of Quest Defendants' improper removal of this case to federal court.  The language of 28 U.S.C. § 1447(c) directs that the award of attorney's fees rests squarely within the discretion of the district court when a remand is ordered.  *See* § 1447(c) ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.").  As the Tenth Circuit has recognized, "[i]n deciding whether to award costs under § 1447(c), the key factor is the propriety of the defendant's removal. The district court does not have to find that the state court action has been removed in bad faith as a prerequisite to awarding attorney fees and costs under § 1447(c)." *Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 322 (10th Cir. 1997).  On the other hand, attorney's fees may be denied where the defendant "had a fair basis for removing the case." *Daleske v. Fairfield Cmtys., Inc.*, 17 F.3d 321, 324 (10th Cir. 1994).  The proper inquiry is whether the defendant had objectively reasonable grounds to believe the removal was legally proper. *Martin*, 393 F.3d at 1147.

Here, the Court recommends that the presiding judge decline to award STC attorney's fees. Even though the Court recommends a finding against Quest Defendants on the merits of removal, it finds that such removal was premised upon a reasonable belief that subject matter jurisdiction existed under federal question, federal patent, patent counterclaim, or diversity jurisdiction.

Wherefore,

**IT IS HEREBY RECOMMENDED** that STC.UNM's Motion to Remand (*Doc. 12*) be granted;

**IT IS FURTHER RECOMMENDED** that STC.UNM's Motion to Dismiss Defendants' Counterclaims (*Doc. 10*) be denied as moot;

**IT IS FINALLY RECOMMENDED** that this matter be remanded to the Second Judicial District Court, County of Bernalillo, State of New Mexico.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES MAGISTRATE JUDGE